## SMITH *v.* THE PEOPLE.

RECORD — COMMON LAW — *how constituted.* At common law the testimony of witnesses, the opinions of the court upon questions of evidence, the charge of the court to the jury, and other incidents attending the trial of a cause, did not appear in the record.

RECORD — BILL OF EXCEPTIONS — *statute of Westminster.* The statute of Westminster which gave the bill of exception had no application to criminal causes.

RECORD — *bill of exceptions in criminal cause.* A statute of this territory (4 Sess. 92) makes it the duty of a judge to sign and seal a bill of exceptions in a criminal cause, when tendered to him, and provides that such bill of exceptions shall be filed by the clerk and shall become a part of the record of such cause.

RECORD OF EXCEPTIONS — *how made.* Exceptions to the rulings, opinions and decisions of the court form no part of the record until they are reduced to writing and signed and sealed by the judge.

And if no exception to the ruling or decision of the court is taken at the trial, the ruling or decision cannot be put on record.

ERROR — *must appear of record.* And error cannot be assigned as to matters not of record.

ERROR — *instructions not excepted to.* Where no exceptions were taken to the ruling of the court as expressed in the instructions to the jury, error cannot be assigned as to such ruling.

VERDICT OF GUILTY — *sufficiency.* Upon an indictment for murder a verdict of guilty is a conviction of the offense charged in the indictment.

NEW TRIAL — *verdict supported by evidence.* Where the prisoner went to the house of deceased with R. and after some words with deceased the prisoner knocked him down, and thereupon R. put a rope around deceased's neck and strangled him to death, and the prisoner and R. carried deceased's body some distance from the house where the homicide was committed and threw it into a running shaft, a new trial will not be granted on the ground that the evidence is not sufficient to support a verdict.

HOMICIDE — INTENT — *unlawful act.* If two or more persons combine to do an unlawful act, and in the prosecution of the unlawful design death ensue to any, the killing will be murder as to all of the participants in the unlawful purpose.

*The prisoner having made a violent assault* upon deceased and having assisted in carrying away and concealing deceased's body, even if the killing was done by another, the prisoner must be regarded as aiding, abetting and assisting in the perpetration of the crime.

NEW TRIAL — *newly-discovered evidence.* A new trial will not be granted to enable the prisoner to obtain evidence which does not tend to excuse or mitigate the crime.

## Error to District Court, Gilpin County.

THE plaintiff in error was indicted for the murder of Wm. Hamblin, and the jury found him guilty. At the trial the evidence was as follows :

John Y. Glendenin testified : In February last I was called by Sheriff Grimes to attend a coroner's inquest upon the body of William Hamblin. I went over with others and found the man in a shaft ; we got the body out of the shaft ; there was a rope around the neck and another around one of the wrists ; I cut the rope off with a knife ; there were gashes on Hamblin's head. We examined in the house and found a pool of blood by the door, and this stick (here the witness identified the stick) ; there was hair on one of these knots and the stick was colored by blood. The place where the body was found and the house are in Gilpin county.

Joseph Harper testified : I was down the road between here and the gate and saw some men gathered together, and they were talking about this murder, etc. The prisoner and several men were there ; some of the men asked the prisoner questions ; they asked him what made him do such a horrible deed, and what he hit him with ? the prisoner said he got mad and hit him with the stool he was sitting on and knocked him down. He said he was likely to get up again and he hit him with a chunk of wood and knocked him down again. The murder occurred a night or two before this conversation ; the prisoner said that in struggling around Hamblin made such a fuss that they put a string around his

neck and another around his arm, and hauled him off and
put him in a shaft. Both of them hauled him up the hill,
one started with him and the other gathered hold and
helped. The prisoner said he was sorry that he did it. He
said that he knocked Hamblin down twice; there was con-
siderable chat there which I do not now recollect; no
threats toward the prisoner were made; we were sitting on
a wood pile at the time of the conversation, and the prisoner
said that the name of the man who helped him was Robert
Reynolds.

Cross-examination: There were about five men present at
the conversation with defendant; Mr. Brown, the officer, was
there; I don't recollect the others who were present; I
remember only Brown and the prisoner; I then supposed
that defendant was a prisoner and in charge of the officer;
I cannot tell what was said before I came there; they were
about sitting down when I came in sight; I do not know
whether or not I heard all of the conversation; I am sure
the prisoner said he got mad and hit Hamblin with a stool;
he referred to himself as the person who got mad; he said
something about a chair I think, but I did not hear him say
that Hamblin struck him with a chair; I understood that
this man struck Hamblin two blows, and Bob Reynolds
struck the third blow. I cannot say that the prisoner
stated which of them started to drag Hamblin's body to the
shaft; he said one started and the other took hold and
helped drag Hamblin to the shaft; the prisoner said that he
and Bob Reynolds put Hamblin in the shaft.

John C. Bruce testified: I knew William Hamblin in his
life-time; he lived in Chase Gulch and he was a milkman;
I saw his body just after it was taken from the shaft; the
shaft is twenty or thirty yards from the house, in a south-
easterly direction. I think it is a little up hill from the
house to the shaft; Hamblin's pockets were turned wrong
side out when I saw him.

Dr. R. G. Adudell testified: I practice medicine and sur-
gery; I saw the body of William Hamblin in the shaft
before it was taken out; the feet were invisible from the

top ; from the position in which Hamblin lay in the shaft, I supposed he was thrown in by two persons ; if he had been thrown in by one person the body would have gone out of sight ; I don't remember whether the body lay on the side or upon the face ; the body of Hamblin was taken out of the shaft ; there was a ragged wound on the top of the forehead, a rope around the neck very tight, and another rope around the wrist ; the rope around the neck was very tight, it was buried in the neck about two-thirds its width ; in carrying the body from the house to the shaft, some places it was carried clear of the ground and others it was allowed to drag upon the ground ; Hamblin might have been dead twelve or fifteen hours when we came there ; there was still warmth in the stove in the house when we came there ; the fire had not burned down ; I think Hamblin was still alive when the rope was put around his neck ; he came to his death by strangulation ; the blow on the head would knock him down.

Cross-examination : I think that the body of Hamblin was dropped into the shaft, not thrown down ; the position of the body showed this ; if the body had been thrown in it would have been doubled up more ; I think Hamblin died of strangulation produced by the rope around his neck ; I am inclined to believe he was dead before he was taken from the house ; I think Hamblin was taken to the shaft by two persons ; I did not see any signs of his being dragged by one person, but he might have been dragged by one person near the door ; the marks on the ground were of the hips dragging and not the limbs ; there were no marks of the heels upon the ground ; the appearances were of the body being carried by one person at the head and another at the feet, and the hips sometimes dragging on the ground ; I did not see in or about the house any rope of the kind which was around Hamblin's neck ; the rope around the neck was of a different twist from that in the house ; it had evidently been brought there.

Hinds testified : I was upon the coroner's inquest touching Hamblin's death ; before the body was brought up from

the shaft we could see it; it lay upon the back; the body had moved very little from where it first struck; I saw the body when it was hoisted from the shaft; the pockets were turned wrong side out; there were two cords around Hamblin's neck; one of the cords was tied very tightly and the other one loosely; there was no rope about the house like the one that was tight on the neck; there was rope in the house like the one that was loose on the neck; there was water on the stove in the house which was warm; there were gashes on Hamblin's head that could have been made with this stick (referring to the stick mentioned by Mr. Glendenin, in his testimony).

Samuel Merrick testified: I live between Smith's Ranche and Clear Creek, four miles below Black Hawk. The next morning after the killing of Hamblin, two men stopped at my house and got breakfast, and this man here (the prisoner) looks like one of them; they came soon after it was light; I had just got up in the morning.

Cross-examination: This man looks very much like one of the men that stopped there that morning for breakfast; he is of the same build, I suppose that he is one of the men.

John C. Bruce, re-called, testified: I think I have seen the defendant down by Fitzpatrick's mill, in Black Hawk. He was with another colored man. They went off up Chase's Gulch. I saw them about half-past five or six o'clock one Saturday night before the killing of Hamblin. Hamblin was killed on Sunday, and this was the Saturday night before that.

Cross-examination: I know this man's countenance, and I think he is the same man I saw near Fitzpatrick's mill.

Chelton M. Grimes testified: I am the sheriff of Gilpin county; I have had the defendant in my charge since about the middle of February last. We have talked frequently about the murder of Hamblin. I never made any threats against the prisoner or held out any inducements to him to get a confession. The prisoner said that he got into a bad scrape, that it was Reynolds' fault, and that Reynolds got him to go there with him. The prisoner said that Hamblin

used words that he did not like and then he struck Hamblin with a chair; that then Bob struck Hamblin, and then he threw something at Hamblin; I think it was a stick of stove wood, and hit Hamblin on the shoulder and Hamblin fell down. That Bob then hit Hamblin on the head with a stick of stove wood, and Hamblin commenced groaning and making a noise, and Bob put the rope around Hamblin's neck to prevent him from making the noise. The prisoner said that, when Bob put the rope around Hamblin's neck, he told Bob that was wrong, and asked him how he would like to be served that way. Bob said it made no difference, he was dead any how.

He said that Bob put the rope around Hamblin's wrist and asked him to help take Hamblin to the shaft and throw him in. The prisoner said he refused to help Bob at first; that Bob dragged Hamblin out of the house and then he, the prisoner, helped until they got to the shaft, and then Bob threw Hamblin into the shaft. The prisoner said that Bob went down to the house and he went down to the cabin below and stayed there until nearly morning, and then Bob came down and they started off together. He said they went down near the Child's House, at foot of Guy Hill, and stopped in the woods and counseled for awhile, and finally went down to the Child's House, where they had been stopping before. The prisoner said he was very sorry for it; that he had never done any thing like it before. Bob said that he was not sorry; that he had done the like before many a time. The prisoner said they were stopping at the Child's House before the murder; that they left the Child's House the evening of the murder and came up to Hamblin's. The prisoner said they left the Child's House to come up to see Mr. Pickle to get some money he was owing them for wood and to go to Hamblin's and get some blankets Hamblin had of theirs; that they did not see Mr. Pickle; that when they got opposite Mr. Pickle's house Bob didn't want to go there, but wanted to go up to Hamblin's; that they went to Hamblin's about dark and stayed there some time—several hours—before any difficulty

commenced.   The prisoner could not tell what time he left Hamblin's house ; it was some time in the night ; he supposed about eleven o'clock. This conversation occurred about the first opportunity the prisoner had to talk to me after he was put in jail ; the prisoner was very anxious to talk to me.   I think the first conversation I had with him was before the coroner's inquest was held.   I guess it was the first evening after he was brought in ; on going in the jail the prisoner was frightened at the crowd around the jail, but he seemed content when I told him that he was in no danger there in the jail, that the crowd couldn't get in there.   I do not think the conversation was long after the prisoner was put in jail.   After Robert Reynolds was put in he made about the same statement as the defendant. The defendant said Bob locked the door of Hamblin's house and threw the key away, and Bob said the same ; they described the place where the key was thrown, and Mr. Hamblin, the brother of the deceased, afterward found it there.   I have talked with the prisoner about the matter frequently, and there has been nothing like a denial of guilt on his part until within a few days.

Cross-examined : At the time of the first conversation with the prisoner there was no excitement out of doors. There was a crowd around the door when the prisoner was put in jail, but they went away soon, and at the time of the conversation there was none there.   The conversation was two or three hours after the crowd had left ; the defendant did not seem to be excited.   The defendant said that they were disputing with Hamblin about blankets ; that Hamblin refused to give them the blankets, and he struck Hamblin with the stool ; that Hamblin struck back and then Bob joined in the fight.   I think he said Hamblin ordered them out of doors.   Defendant did not speak of time passing between the time Bob got Hamblin out of doors and the time they hauled him off to the shaft ; defendant said that Bob threw Hamblin into the shaft.   I think defendant said that he stepped out of the door where so much blood was, while the body was there.   Defendant did not say that Bob used

threats to compel him to help haul the body of Hamblin away ; it seemed that Hamblin and the defendant disputed altogether, and Bob had nothing to say until the fight begun ; they talked quietly for some time before the difficulty arose. Within the last few days the defendant has said that Bob was guilty, and he, the defendant, was not guilty.

Re-direct : Bob Reynolds was arrested and brought in four or five days after the defendant was arrested.

A portion of the charge which was given to the jury was as follows :

"In no view which can be taken of the evidence in this cause is the accused guilty of manslaughter ; if not guilty of the crime charged in the indictment, he is not guilty of any crime whatsoever under the law."

No exception was taken to any portion of the charge. The counsel for plaintiff in error contended that this instruction was erroneous. The jury returned a verdict of guilty, and a motion for new trial being made and overruled, the plaintiff in error excepted to the ruling of the court upon that motion. Upon the hearing of the motion for new trial, certain affidavits were read as follows :

"THE PEOPLE OF THE TERRITORY OF COLORADO
*v.*
GEORGE SMITH.

George Smith, being first duly sworn, says he has heard the affidavit of Clara Brown read and knows its contents, that he was not aware of the existence of any such testimony as that contained in the said affidavit until after his trial ; that he did the best he could to prepare for his trial, and told his counsel and others for what purpose he went to the house of William Hamblin, and that such purpose was to get his blankets ; that he had no knowledge that said Hamblin intended to keep said blankets until he arrived there, and that he had no knowledge whatever that said Hamblin had declared his intention so to do until after the trial of the cause ; that he revealed his own case to his counsel and made every effort possible in his circumstances

to prepare for his defense; that his failure to discover the evidence contained in the affidavit of Clara Brown is not the result of his negligence, but that such failure is to be attributed to the fact that the same never was divulged to any one until after his trial.

The People of the Territory of Colorado
v.
George Smith.

Clara Brown, being first duly sworn, says she is a resident of Gilpin county, and knew William Hamblin during his life-time; that on the Thursday morning previous to the Saturday on which he was killed, said Hamblin was at her house in Central City in said county; that on said morning she had a conversation with him, said Hamblin, in respect to some colored men that had been stopping over with him in a cabin, and had been chopping wood; that said Hamblin complained that said colored men had used him badly, had taken away his pistol and some cups and plates belonging to him; but that he, Hamblin, had then in his possession some blankets belonging to them, enough to make him whole in respect to the property taken away by them; that she never told this conversation to said George Smith or his counsel before the trial of said cause, and that she never supposed the same could ever have any thing to do with the trial of said Smith until after the trial, and she had heard what said Smith had said as to going to the house of said Hamblin to get his blankets.

Messrs. Johnson & Teller and Messrs. Royle & Butler, for plaintiff in error.

Mr. I. N. Wilcoxen and Mr. C. C. Post, for the people.

Gorsline, J.    The plaintiff in error, George Smith, was indicted at the May term, 1868, of the district court of Gilpin county, for the murder of William Hamblin. He was arraigned and pleaded not guilty, and was tried at the same term, the chief justice presiding. The jury returned

a verdict of guilty, and the prisoner sued out a writ of error from this court. There were no exceptions taken at the trial to the decisions of the court in admitting or rejecting testimony, or to the instructions given to the jury in behalf of the people, or to the refusal by the court to give instructions asked for by the prisoner. The only exception taken was to the decision of the court in overruling the motion for a new trial interposed by the prisoner.

The argument of the case in this court was not confined to the exception taken as mentioned above, but extended to a discussion of such instructions given by the court below, as the counsel for the prisoner conceived to be erroneous, and to the refusal to give other instructions asked for by the prisoner. We permitted this, reserving the right to consider whether we could, in accordance with the law, regard matters which were not contained in the record before us.

It becomes us then to determine on this presentation of the case the appellate jurisdiction of this court, and to ascertain whether agreeably to the forms of law we can decide upon matters, which in no legal manner have been submitted for our consideration. At common law a writ of error only carried to the superior court such matters as appeared of record. The testimony of witnesses, the opinions of the court upon questions of evidence, the charge of the court and other incidents attending the trial of a cause never appeared upon the record, and therefore were never removable by writ of error. This rule being extended as well to criminal as to civil cases it followed, as a necessary sequence, that a person convicted of crime, although many errors might have intervened in the course of the trial, was remediless except by an appeal to the consideration of the same court in which such errors occurred.

To remedy this evil the statute of Westminster 2d, 13 Edward I, chapter 31, was enacted, which gave the bill of exceptions. It was considered in England, however, and so adjudged, that this statute, although general and unrestricted in its phraseology and terms, had no application to criminal causes. This statute has been substantially enacted in this

territory, and we suspect in most of the States of the Union. In some of them, however, the courts being of the opinion that the statute did not apply to criminal cases, the legisla- tures of the respective States were compelled to extend the law specifically to that class of cases.   In Pennsylvania, for instance, the orginal statute of Westminster 2d was passed in 1792, yet the court entertaining the opinion that it did not apply to criminal cases, persons under conviction for crime had no redress until the year 1860, when a law was passed which gave defendants, under indictment for murder or voluntary manslaughter, the right to except to the decis- ion of the court upon any point of evidence or law, which exception should be made a part of the record as in civil cases.   Thus it will be seen that in that State, previous to 1860, a defendant convicted of murder, notwithstanding errors very dangerous to him might have been committed during the progress of the trial, had no remedy whatever, except perhaps a motion for a new trial, addressed to the same court in which the error occurred.   Our statute (Laws 1865, page 92) makes it the duty of the judge before whom any case shall be tried in the district court to sign and seal a bill of exceptions when tendered to him, and provides that such bill of exceptions, when allowed, signed and sealed by the judge, shall be filed by the clerk, and *shall become a part of the record of such cause.*   It follows, then, that exceptions to the "rulings, opinions and decisions" of the court, as expressed in the statute, form no part of the record until they are reduced to writing and signed and sealed by the judge ; much less can it be said that the proceedings on the trial of a case form a part of the record of such case, when no exceptions whatever were taken to the same.   The question now arises, whether this court can, we will not say with propriety, but according to uniform and established rules of law, take cognizance of such proceedings as occurred in the progress of the trial, which do not come before us in any approved or legal manner.   To this ques- tion there can in our opinion be but one answer.   We should wander very far from the line of our duty if we

should assume to determine matters which do not appear in the record before us. The evil consequences of such a precedent would greatly outweigh any good or favorable result which could be derived in a particular case, however important it might be. It would be contrary to the law as we understand it from the nearly uniform decisions of the courts, and we are bound to decide according to law. By doing so we should undertake to review points first made in this court, and not taken in the court below or made a part of the record of the case.

In the case of *Hopkins* v. *The Commonwealth*, 50 Penn. 9, which was also an indictment for murder, the chief justice, in delivering the opinion of the court, with great emphasis inquires, in regard to a point to which no exception had been taken at the trial, if it would not be an impertinent interference with the established course of administering criminal law to obtrude a discussion of the point which was suggested by counsel in the argument. And the court, in that case, held, that they could not legally inquire whether that part of the charge of the court below, to which no exception had been taken, was correct or otherwise. The courts of this country, which proceed according to the course of the common law, have been nearly uniform in their decisions upon this question. There is one remarkable exception, which we will presently notice. The supreme court of the United States has expressed but one language, and has always held that objections to instructions given, or to the refusal to give instructions asked, can only be taken advantage of and preserved by bill of exceptions. *Pomeroy's Lessee* v. *Bank of Indiana*, 1 Wall. 592 ; *Thompson* v. *Riggs*, 5 id. 663. The latter case is somewhat remarkable in this, that the counsel for the defendant in error waived the objection that there was no proper bill of exceptions to raise the principal question involved in the case. Notwithstanding this waiver, the court declined to discuss it on the ground that the record was not properly before them. Justice CLIFFORD, in rendering the opinion of the court, says : " Settled practice in

this court is, that neither the rulings of the court in admitting or rejecting evidence, or in giving or refusing instructions, can be brought here for revision in any other mode than by a regular bill of exceptions." And, in relation to the · practice generally, he further says: "Instructions requested or given rest in parol, and do not, in the practice of this court, or in any other court where the common law prevails, become a part of the record unless made so by a regular bill of exceptions, sealed by the judge who presides at the trial." The instructions which are given or refused, or whatever else may transpire, *ore tenus*, during the trial, become no part of the record, any more than do the arguments of counsel, until exceptions to the same are signed and sealed by the judge, when, upon filing the same with the clerk, according to the statute, they form a part of the record. There is a decision, however, in conflict with the opinion we have announced herein, and, we believe, also opposed to the uniform decisions of the courts of common laws in this country and in England. It is in the case of *Falk* v. *The People*, reported in 42 Ill. 331. The question arose upon an instruction given by the circuit court, to which no exception was taken. In the opinion of the court, which upon this point contained no argument, and we suspect that court could find neither reason, argument or authority to sustain the extraordinary decision which they made, we find the following inquiry: "Suppose all the instructions given by a court to a jury in a capital case are wrong, that they do not announce correct legal principles, or, being correct, are inapplicable to the case, and no exceptions are taken to them, would it be the duty of an appellate court, under such circumstances, when the record shows the prisoner has been illegally condemned by misapplication of the law to his case, and he asks a review of the proceedings, that such court, in the face of the record, should pronounce the sentence of death upon him?" Now, with great deference, we say that what is implied by this inquiry is a begging of the whole question. It assumes that, in some manner, not by the record, for as we

have seen, the only way to make an instruction a part of the record is by exception signed and sealed, but perhaps by street rumor, by a newspaper report, or by what some person may have told the court, they are informed that a certain instruction was given. The court evidently makes a point that it is a capital case. In *Shorter* v. *The People*, 2 N. Y. 193, which was an indictment for murder, the court, certainly one of as high authority as that of Illinois, speaking through Justice BRONSON, one of the ablest judges who ever adorned the bench of that State, says : "The law concerning bills of exceptions is the same in criminal as in civil cases," and further says : "We should not allow our feelings to draw us into the making of a bad precedent." In the case of *Gill* v. *The People*, decided at the same term as *Falk* v. *The People*, and reported in the same volume, which was an indictment for an assault with intent to kill, the court absolutely refused to review the proceedings in the circuit court, because they were not preserved by bill of exceptions, and they had no record before them. It will be seen, therefore, that the supreme court of Illinois, in the case of *Falk* v. *The People*, not only contradicted their former decisions but ignored the cases of *Hopkins* v. *The Commonwealth*, *Shorter* v. *The People*, *Thompson* v. *Riggs*, and, we may add, the opinions of respectable courts everywhere. It may be thought that we can consider this case as upon an agreed statement of facts. This cannot be for two reasons. First, the transcript sent up by the clerk of the district court does not contain, nor does it pretend to contain the *facts*, but it does purport to contain the *evidence*, which consists of the testimony of witnesses. Second, Because the rulings and opinions of the district court cannot be reviewed in this manner ; it can only be done by bill of exceptions. *Pomeroy's Lessee* v. *State Bank*, 1 Wall. 592. It is alleged as error that the verdict of the jury was informal and insufficient. The verdict was in these words : "We, the jury, find the defendant guilty." Under the indictment in this case the jury might have found the prisoner guilty of manslaughter, and it is urged that

they should have specified in their verdict of what offense they convicted him. We are referred, in support of this proposition, to the case of the *State* v. *Dowd*, 19 Conn. 387, and *McGee* v. *The State*, 8 Mo. 495. It will be found upon examination, however, that these decisions were given under peculiar statutes of those States. In Connecticut the statute prescribed that the jury, if they should find the defendant guilty, should ascertain in their verdict whether it be murder in the first or second degree. The court, in its opinion, states that this is a positive provision of the statute, without any exception or qualification. And so in Missouri the statute provided that, "Upon the trial of any indictment for any offense, where by law there may be conviction of different degrees of such offense, the jury, if they convict the defendant, shall specify in their verdict of what degree of offense they find the defendant guilty." These statutes seem to be imperative, and the courts of those States were compelled to yield obedience to them. We have no statute upon the subject, and our practice has conformed to the general practice of courts in those States where they have no peculiar statutes with reference to the matter.

Mr. Bishop, in his very excellent work on criminal proceedure, vol. 2, sec. 627, says: "That a general verdict of guilty convicts the prisoner of all matters which are well charged against him in the indictment." So are the cases of *The People* v. *Marsh*, 6 Cal. 542 ; *Bond et al.* v. *The People*, 39 Ill. 26, and numerous others which might be cited. We are of the opinion that this verdict is sufficient in form. The prisoner made a motion in the court below for a new trial, on the ground, among other things, that the verdict was against the law and the evidence, and also because of newly-discovered evidence. This brings up the question as to whether there was sufficient evidence to sustain the verdict. It seems, from the evidence, that the prisoner and Robert Reynolds, both colored men, were at the cabin of Hamblin on the night of the affray, which resulted in his death. For what purpose they were there, is not disclosed. The evidence consisted mainly of the confessions of the prisoner ;

some made immediately after his arrest, and some at different times while he was in prison previous to his trial. The first were made in the presence of Joseph Harper, a witness, who testified to them, and who says that the prisoner on being asked why he did such a horrible deed, and what he hit the deceased with, replied that he got mad and hit him with the stool he was sitting on, and knocked him down; that the deceased was likely to get up again, and he hit him with a chunk of wood and knocked him down again; that, in struggling round, Hamblin made such a fuss that *they* put a string around his neck and another around his arm, and hauled him off and put him in a shaft; that the prisoner struck the deceased two blows, and Reynolds struck him once, and that they dragged him to the shaft and put him in. The confessions made by the prisoner to Mr. Grimes, the sheriff, after he was confined in jail, vary in some respects from the foregoing. He admits having commenced the affray by hitting the deceased with the stool and the piece of wood, but says that Bob put the rope around his neck; that he remonstrated with him for so doing, and that Bob replied that it would make no difference, for he was dead anyhow. He also, in these conversations with the sheriff, admitted that he and Reynolds dragged the body to the shaft, and Reynolds threw it in; that Reynolds went back to the house, and he to a cabin below, where they remained until nearly morning, when they went together to the Childs' House at the foot of Guy Hill; that the dispute was between Hamblin and the prisoner about some blankets, and Bob had nothing to say until after the *fight* commenced. The prisoner also stated that Bob locked the door and threw the key away, describing the place where it was thrown.

Such were mainly the confessions made by the prisoner. The body of the deceased was found in a shaft as proven, some twenty or thirty yards from the house; when found, there was a rope tied tightly around the neck so as to be imbedded in the flesh; another rope, also, loosely drawn around the neck, and another around the wrist were dis-

covered; his pockets were turned wrong side out; there was a pool of blood near the door, and a stick was found colored with blood; there were gashes on the head of the deceased, and the surgeon testified that they were made by blows sufficient to knock him down; the key of the house was found in the place designated by the prisoner. The surgeon also testified that the death was caused by strangulation. Such were the main facts upon which the jury found the verdict of guilty, and the question is, whether upon this evidence the jury were warranted in their conclusion, or whether the verdict should be set aside, and a new trial awarded.

Murder is defined in our statute to be the unlawful killing of a human being in the peace of the people with malice aforethought, either express or implied. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears, or where all the circumstances of the killing show an abandoned and malignant heart. These are statutory definitions (Laws of 1861, page 292) and are similar to the common law. We presume that if Reynolds and the prisoner had been tried together, there could have been but little question as to the correctness or justice of the verdict. We also presume that if the confession of the prisoner, as narrated by the witness Harper, stood alone, disconnected from that made to the witness Grimes, there could no lawyer be found, who would question it. In *Rex* v. *Shaw*, 6 Carr. & Payne, 480, the prisoner confessed that he and the deceased quarreled; that the deceased struck him and the prisoner knocked him down; he got up and the prisoner knocked him down again and kicked him, and then put a rope around his neck and dragged him into the ditch. This case only differs from the one at bar in this, that only two participated in the fight and the deceased struck the first blow, certainly under greater provocation than is proven to have existed in this case. "But," said PATTERSON, Justice, "if two persons fight,

and one of them overpowers the other and knocks him down and then puts a rope around his neck and strangles him, that is murder. The act is so willful and deliberate that nothing can justify it.'' There can be no doubt, we think, that this proposition is correct, and we might cite many more cases of similar purport, if we did not deem it entirely unnecessary. Now the confessions made to Sheriff Grimes stand upon a basis a little different. In those statements the prisoner asserted that Reynolds put the rope around the neck of the deceased against his remonstrances. His statements, however, in regard to the rest of the affray are substantially the same as those related by the witness Harper. It was contended in argument that, although the prisoner commenced the affray, yet the act by which the killing was effected was performed by Reynolds, and therefore he and not the prisoner was the one guilty of murder. We do not believe such to be the law. · If two persons combine to do an unlawful act and death ensue, it is considered by writers on criminal law and by the decisions of the courts to be murder as to both of the participants. Here the prisoner, without any provocation which appears in proof, with a stool and with a chunk of wood, knocked the deceased down twice, once at least hitting him on the head, and after his confederate Reynolds had tied the rope around his neck, the prisoner assisted to drag the body some forty or fifty yards to a place of concealment. If this was not murder on the part of the prisoner, we think it cannot be denied that he did stand by and ''aid, abet and assist'' in the perpetration of the crime. The principle is well stated in the case of *Brennan et al.* v. *The People*, 15 Ill. 511. The court say : '' The prisoners may be guilty of murder, although they neither took part in the killing nor assented to any arrangement having for its object the death of Story. It is sufficient that they combined with those committing the deed to do an unlawful act, such as to beat or rob Story, and that he was killed in the attempt to execute the common purpose.''

The motion for a new trial was further made on the ground of newly-discovered evidence after the trial and ver-

dict, and was supported by the affidavit of Clara Brown. We cannot conceive that what she states in her affidavit could have made any possible difference in the result. Certainly none in favor of the prisoner. If any thing, it would have told against him, as exposing a motive on the part of these men in being at the cabin of Hamblin, from which the jury might well have inferred a malicious intent.

The prosecution might well have admitted every thing stated in the affidavit as true without any injury to its cause. We believe, therefore, on this whole record, that the prisoner, upon the law and evidence, is guilty of the murder of William Hamblin, and that the jury, in rendering a verdict of guilty, arrived at a correct conclusion.

The judgment of the district court is affirmed.

*Affirmed.*

A petition for rehearing was presented by counsel for the prisoner, and, at an adjourned session of the court in January following, the petition was denied.

Mr. Justice GORSLINE was not present at that session, and the opinion of the court was drawn up by

HALLETT, C. J. The plaintiff in error asks a rehearing in this cause, mainly upon the ground that the opinion of the court is erroneous upon the question of practice respecting exceptions to instructions given in the court below. This point was very fully considered in the opinion of the court, and we have re-examined it with such care and attention as we are able to command. It is urged that the authorities cited in the opinion of the court are not to be regarded in this territory, for the reason that, in the States from whence they are taken, it is the practice to charge juries orally, while our statute requires such charges to be reduced to writing. In the first place, it is to be observed that it was always the practice in civil cases, and in criminal cases where exceptions were allowed, to write down the part of the charge objected to, and the statute has simply changed the time for putting the charge into writing and

provided that the whole shall be written out, whether objected to or not. We do not perceive that the objection and exception to the ruling of the court, which was always necessary, is, by the statute, rendered unnecessary. The obvious intention of the statute was to prevent mistake or misapprehension respecting the language used by the court, by requiring that the charge should be put into writing, and there is nothing to show that it was intended that the instructions, when written down, should become part of the record. It is not provided that the instructions shall be authenticated in any way whatever, or that they shall be filed among the papers in the cause. It is true that the judge is required to signify his approval by writing the word "given" in the margin of the instructions, and his disapproval by the word "refused," but this is so obviously designed as a mark of distinction rather than of authentication, that we think it not necessary to comment upon it. We cannot lightly assume that it was intended to incorporate the instructions into the record without any authentication whatever. The mere filing of a paper in a cause is not alone sufficient to make it a part of the record. In *McKinney* v. *The People*, 2 Gilm. 551, the rule upon this point was stated as follows:

"In a criminal case, after the caption stating time and place of holding the court, the record should consist of the indictment as found by the grand jury, the arraignment of the accused, his plea, the impaneling of the traverse jury, their verdict, and the judgment of the court. This, in general, is all the record need state. If, during the progress of the prosecution, motions are made and overruled, the facts can be preserved by a special entry on the record, or by bill of exceptions. In one or the other of these ways it is necessary to preserve every fact that the prisoner may deem essential to his rights, and a fair and regular trial."

We believe this to be good law, although the same court seems to have adopted a different rule in *Falk* v. *The People*. According to this rule, instructions do not become a part of the record unless made so by bill of exceptions.

Again, the language of the statute of 1865, respecting exceptions in criminal cases, seems to leave no doubt as to the necessity of an exception upon every point reserved for the consideration of a court of review. That statute is as follows:

"In all cases in the district court where either party shall except to any ruling, decision or opinion of the court, and shall reduce such exception or exceptions to writing, it shall be the duty of the judge to allow the same, and to sign and seal the same. * * * And when such bill of exceptions is so allowed, and signed and sealed by the judge, * * * * it shall thereupon be filed by the clerk, and shall become a part of the record in such cause."

It will be noticed that the statute does not declare that the ruling of the court alone, however certified, shall become part of the record. It is only when such ruling is accompanied by an exception, and is properly certified, that it gains the legal quality necessary to its admission to the record. Bouvier defines an exception to be, "the statement in writing of the objection made by a party in a cause to a decision of the court on a point of law, which, in confirmation of its accuracy, is signed and sealed by the judge or court who made the decision."

From this, it appears that three things are comprised in an exception; the ruling of the court, the objection thereto, and the authentication. The objection of the party appears to be quite as indispensable as either of the other qualities, and we know of no ground upon which it can be said to be unnecessary. It is one of the essential elements of an exception, and the exception cannot exist without it. In *Falk* v. *The People*, the supreme court of Illinois assumes that the record shows the instructions, which is the very point in controversy. How can the record show the instruction when the exception for which the statute calls, and which is the essential condition upon which they are to be entered of record, is wanting? For ourselves, we must continue to say that we cannot thus interpret the law. It is written that exceptions to the rulings of inferior courts shall be

entered of record, and shall be open for review in this court, and we cannot say otherwise, even if we would. What is here said will furnish an answer also to the suggestion, that the instructions being found in the bill of exceptions are the subject of judicial cognizance in this court. We have here the certificate of the judge who tried the cause as to these instructions, but in the absence of any exception to them we are not judicially informed of their character. The modern practice of putting all the exceptions taken throughout the whole course of a cause into a single bill has not changed the rule that each exception stands upon its own merit. The circumstance that a ruling to which no exception has been taken is incorporated in the same bill with another ruling to which an exception has been taken, cannot affect the status of the former. Each must stand or fall by itself. It was also urged that the judge of the district court should have entered exceptions in behalf of the accused, or, at all events, that it ought to be assumed that all exceptions were taken at the proper time. We are acquainted with the ancient maxim, adopted in the days when persons charged with crime were not allowed the assistance of counsel, which declares that a judge shall be counsel for the prisoner, but we doubt whether it has ever been carried so far as to require the judge to object to his own ruling. We may say, with Foster:

"In capital cases the court is so far of counsel with the prisoner that he should not suffer him to consent to any thing manifestly wrong, and to his own prejudice," but this is not saying that the court is bound to object to every thing that is done in the progress of the cause. A proper respect for the maxim would doubtless restrain the judge from misapplying or misinterpreting the law. But if, after stating the law as judge, he should be required as counsel for the accused to state an objection to his ruling, he would appear to be in an exceedingly perplexing situation. One who is bound to lay down the law correctly, and immediately show himself wrong by stating a valid objection to it, is certainly in need of an ingenious mind. If a judge believes a ruling

to be erroneous he ought not to make it, and if he believes it to be correct, he cannot state a valid objection to it. The statute provides that the *party shall except* to the ruling of the court, which is sufficiently explicit and free from ambiguity. There are authorities also which hold strong language upon this point. In *Clem* v. *The Commonwealth*, 2 Metc. (Ky.) 10, which was a capital case we find the following language :

"It is insisted on behalf of the appellant that the circuit court committed errors to his prejudice in admitting important evidence against him. It does not appear from the record, however, that any exceptions were taken to any of the evidence offered by the Commonwealth and permitted to go to the jury, and for this reason, even if it appeared that improper evidence had been admitted upon the trial, the appellant could not avail himself of such error as a ground of reversal."

So also in 1 Bishop's Crim. Law, § 843, it is said : "If the defendant permits illegal testimony to be given to the jury, as shown by his making no objection to it, he cannot afterward claim any privilege on account of its admission." The rule is here stated with reference to testimony, but it is the same in respect to instructions, as we may learn from the case of *Hopkins* v. *Commonwealth*, cited in our opinion in this cause. If a superior court is required to assume that objection has been made to an instruction or to testimony upon a trial in an inferior court, or if a judge upon a trial of a capital cause is bound to interpose an objection when none is made by the prisoner, these authorities are strangely silent upon those points. Upon a careful examination of the opinion drawn up by our brother Gorsline, we are again compelled to express our concurrence therein, and we are constrained to add that we do so under a profound sense of the responsibility resting upon us, as the minister of the law, listening to the last appeal of a wretched man who is about to take his place upon the gallows.

In this connection we will briefly allude to the instructions given upon the trial below for the purpose of freeing

the case from any suspicion of illegality that may be cast upon it. We have not lost sight of the fact that these instructions are not before us in a way which will enable us to pronounce a judicial opinion upon them, but we desire to make some observations for the purpose of showing that the instructions are not, as has been claimed, wholly unsupported by the law. The case of *The People* v. *King*, 27 Cal. 507, was an indictment for murder, and upon the trial in the district court an instruction was given which, as will be seen, was substantially the same as the one of which complaint is made in the case at bar. We give the remarks of the court at length :

"It is next claimed that the court erred in giving the following instruction : 'In the case that is now being submitted to you, there is no evidence on any points or matters given in proof which reduce the crime charged in the indictment to manslaughter ; if the defendant be found guilty, therefore, you cannot consider the question of manslaughter upon the evidence in this cause.' This instruction is not a little obscure, and if it was given as represented in the transcript, it is quite possible that the jury may have found some difficulty in determining its exact meaning. The record does not contain the evidence, or any part thereof, and we cannot, therefore, read the instructions in the light of the testimony in view of which it was given, but are forced to determine its meaning by its own terms. If there was any evidence before the jury tending, however slightly, to reduce the homicide to the grade of manslaughter, this instruction was erroneous. If the expression 'there is no evidence on any points or matters given in proof' is to be understood as admitting that there were 'points and matters given in proof' which, if true, would reduce the offense to manslaughter, but declaring the evidence as to such points or matters to be insufficient to warrant the jury in finding them to be true, it was erroneous, because it assumed to pass upon the weight of evidence which, under our constitution, is left entirely to the jury, and in regard to which the judge, contrary to the rule of common law, is not

allowed to express an opinion. On the other hand, if there was a total absence of all testimony as to such facts and circumstances as would, under the law, reduce the offense from murder to manslaughter, and the instruction is to be understood as declaring such to be the case, then it was not erroneous, because judges, although not allowed to charge juries with respect to matters of fact, may state the testimony and declare the law (sec. 17, art. VI of the Constitution). At common law a judge is allowed to express his opinion as to the weight of evidence. *Commonwealth* v. *Child*, 10 Pick. 252. In this respect the constitutional provision referred to was intended to change the rule so as to leave the weight of the evidence entirely to the jury ; but judges may still, as formerly, state what facts are in evidence and what are not ; or in other words, they may state the evidence *pro* and *con.* in view of which the existence of certain facts is affirmed or denied, which includes the right to state to the jury, that there is no evidence as to particular facts or issues, when such is the case ; counsel for defendant seems to have understood the judge as instructing the jury that there was no evidence as to facts, which, under the law, would reduce the offense charged to manslaughter, and to have excepted to the instruction upon that ground, so understood, there being no evidence of the character in question, the instruction was not erroneous."

So, also, in *The People* v. *Byrnes*, 30 Cal. 207, the court say :

" It is neither necessary nor proper for the court, on the trial of an indictment for murder, to give an extended or any definition of murder in the second degree, unless there is evidence in the case tending to prove that the crime was or may have been of that grade in the given instance. Instructions are always to be given with reference to the facts proved before the jury. * * * The circumstance that counsel conducted the defense on the theory of murder in the second degree, assuming that he did so, did not in itself make it necessary that the court should deal with the case in an aspect which it did not in fact present."

The constitution of the State of California, like our statute, restrains courts from charging juries respecting matters of fact, and therefore these decisions are in point. It is true that the constitution of that State expressly declares that the courts may state the testimony, but as our statute is silent upon that point, and courts were always, by the common-law practice, allowed to state the testimony, we may safely affirm that the law is the same in this territory. We learn from these decisions that it is not error to withdraw from the consideration of the jury a crime concerning which there is no evidence before them. Whether there is any evidence at all to prove a fact charged is always a question for the court, but the sufficiency of evidence to prove the facts charged must be determined by the jury. If, in a case of felonious homicide, the evidence shows the killing to have been deliberate and intentional, there is no question of manslaughter presented, and therefore no reason for submitting that question to the jury. To require the jury in such a case to pass upon the question of manslaughter would be as unreasonable and absurd as to instruct them respecting the crime of larceny. So in the case of the *State* v. *Mill*, 3 Nev. 444. The court instructed the jury that they must find the prisoner guilty of murder in the first or second degree or not guilty; thus taking from them the right to find the prisoner guilty of manslaughter, and the supreme court of that State say: "If it was proper, under such a state of facts, to charge the jury they might, in their discretion, find the prisoner guilty of manslaughter, it was equally proper to charge they might find him guilty of an assault to commit murder, or even guilty of a simple assault, for both of these are crimes of which a party under our statute may be convicted upon an indictment for murder; yet in a case where a party was beyond all question slain, and another party indicted for the murder, it would seem ridiculous to charge the jury that they might find the defendant guilty of a simple assault."

We agree, that if the evidence tends to prove a case of

manslaughter, or if, upon the evidence, there is any doubt whatever as to the grade of the crime, the question of manslaughter ought to be submitted to the jury; but when all the evidence tends to prove murder, if it proves any thing, it cannot be wrong to say to the jury that the only question before them is, whether the accused is guilty of that crime. It is true that in the case at bar the question of manslaughter was withdrawn from the consideration of the jury, but there was no evidence whatever tending to establish that crime. To adopt the language used in *The People* v. *Byrnes:* "We consider that all the evidence tended to prove murder  *  *  *  *  , and it is certain that there is none having the slightest tendency to the contrary."

The evidence in this case shows that the deceased, after being twice knocked down upon the floor of his isolated cabin by the blows of the plaintiff in error, was strangled to death by the latter's companion in the terrible crime. The combat was commenced by the plaintiff in error, so far as we know, without provocation, and after he had reduced his victim to a condition of helplessness, the cause of death was applied by this man and his associate, or by his associate alone. The guilty pair then bore away the body of deceased and threw it into a neighboring mining shaft, and together fled from the scene of the tragedy. According to the statement of one witness, the prisoner protested against the act of Reynolds in tying the rope around the neck of deceased, but if the jury accepted this as true we cannot say that it tended to reduce the crime to manslaughter. The only effect of it would be to deny on the part of the prisoner any participation in the killing. The statute declares, that "in cases of voluntary manslaughter there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury upon the person killing. The killing must be the result of that sudden violent impulse of passion supposed to be .irresistible. And again, the killing being proved, the burden of proving cir-

cumstances of mitigation, or to justify or excuse the homi-cide, will devolve on the accused unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter, or that the accused was justified or excused in committing the homicide."

With the law and the evidence in this case before us, we are unable to perceive that there was any question of manslaughter arising in the case. The accused must be guilty of murder if he is guilty of any thing, and we have already said that we entertain no doubt as to his guilt. We deplore the necessity which rests upon us to declare this conclusion and we would gladly avert the dreadful doom of the wretched man, who now invokes our aid, if it were possible to do so, but we have a duty to perform as officers of the law which cannot be controlled by any feeling of sympathy for the prisoner, and it is in the discharge of that duty that we now declare that the petition for rehearing must be denied.

*Petition denied.*